# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATHAN CALVIN HALL, #342-790 | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-12-3245 |
| WARDEN | * | |
| Defendant | * | |

\*\*\*

## MEMORANDUM OPINION

Pending is an unopposed[1] Motion to Dismiss or for Summary Judgment filed by Defendants Warden Bobby Shearin,[2] Warden Frank B. Bishop, Jr., Case Management Specialist John White, Captain Bradley O. Butler, CO II Brant A. Rice, CO II Robert A. Beeman, CO II Daniel Faulkner, and CO II Randy L. Beal, responding to self-represented Plaintiff Nathan Calvin Hall's ("Hall") prisoner civil rights complaint under 42 U.S.C. § 1983. The court finds an oral hearing unnecessary to resolve the issues. *See* Local Rule 105.6 (D.Md.2011). For the reasons stated below, Defendants' dispositive motion will be granted.

## Background

Hall alleges he was assaulted and his jaw was broken on June 20, 2009, by Western Correctional Institution (WCI) Correctional Officers Rice, Beal, Faulkner, and Beeman. ECF No. 1 at 1-2; *see also* ECF No. 13, Exh. 1 at 12.[3] Hall claims Officer Rice (Rice) called him a

---

[1] Hall was granted additional time to file an opposition with materials in support pursuant to *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975), and twice granted extensions to file his opposition. ECF Nos. 14-16.

[2] Bobby Shearin is no longer warden at North Branch Correctional Institution. Frank B. Bishop, Jr. is presently warden at that facility. Richard J. Graham, Jr. is currently warden at Western Correctional Institution. *See* Fed.R.Civ.P. 25(d)(1) ("An action does not abate when a public officer… resigns or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."). The Clerk will be directed by separate order to amend the docket to reflect these changes.

[3] Defendants' exhibits are docketed at ECF No. 13.

"snitch"[4] and the officers threatened to "get even" with him. *Id.* at 2. Hall states he is now housed at North Branch Correctional Institution (NBCI) where his rights have been violated, he has been subjected to torture tactics, racial profiling, foul play, false statements and false imprisonment. ECF No. 1 at 5; ECF No. 3 at 3. Hall states he was placed in "lock-up" at NBCI for almost eighteen months without receiving a "ticket." ECF No. 3 at 3. As relief, he requests restoration of his good conduct time and damages of $200,000.

In support of their dispositive motion, Defendants have submitted exhibits and declarations. These include the Use of Force Report prepared shortly following the June 20, 2009 incident[5] and the March 24, 2010 Report of the Department of Public Safety and Correctional Services Internal Investigation Unit. Exh. 1 at 5-10 and 15-21. The exhibits are summarized as follows.

### A. Use of Force Report

The use of force incident was summarized by Shift Commander Brad Butler on June 21, 2009, who determined that after Hall attempted to strike Rice, the officer used pepper spray. Hall was then taken to the ground and handcuffed. Exh. 1 at 18. Hall suffered no injury apart from pepper spray exposure, and was escorted to the medical unit for a shower and evaluation. *Id.* Butler found the officers' actions appropriate to control the situation and in compliance with Use of Force Directives. *Id.*

Included in the Use of Force Report is Rice's incident report which states that on June 20, 2009, he was observing inmates returning from the yard. When Officer Beal closed the front slider door to lock the inmates in for a formal count, Hall grabbed the door and pulled it open.

---

[4] Hall provides no facts to support his claim of retaliation by Officer Rice or other corrections officials. To the extent he claims his transfer to NBCI was retaliatory, his claim is unavailing. Hall offers no facts or evidence in support of his claim that then Warden Bishop at WCI subjected him to a retaliatory transfer, *see Adams v. Rice*, 40 F.3d 72, 74 (claim of retaliation is not supported by bare allegations), and he has failed to provide facts showing that his exercise of a constitutional right was a substantial factor motivating the transfer. *See, e.g., Cochran v. Morris*, 73 F.3d 1310, 1318 (4th Cir. 1996).

[5] Officers Rice and Beal's reports are neither signed nor dated.

2

Rice called Hall to the lobby area to see his identification card. Rice answered "What the fuck for" and refused to provide the card without an explanation. Exh. 1 at 19. Rice then ordered Hall to place his hands on the wall for a pat down and to find the I.D. card. According to Rice, "[a]s I approached Hall, he turned towards me removing his knit hat and t-shirt and aggressively charged at me with a closed fist. I drew my pepper spray and applied two short bursts to Hall's upper chest and facial area." Officers Faulkner and Beeman responded and "took Hall to the ground and placed handcuffs on him." *Id*. Hall was then escorted to the medical unit.

    **B. Investigation Report of June 20, 2009, Incident**

Hall notified the Internal Investigation Unit (IIU) of the assault by letter on August 18, 2009. Exh. 1 at 5, 12-13. Hall claimed officers "beat me in the head, face, side, bend my legs back, fracture my jaw." *Id.*

Detective Sergeant Raymond Wills was assigned to investigate Hall's allegations. In compiling the IIU report, Wills interviewed Hall, the officers involved, and witnesses. Wills found the lobby area at issue was not monitored by video surveillance camera, and Hall's medical file did not evidence that he suffered any injuries apart from pepper spray exposure as a result of the use of force incident. Exh. 1 at 9; Exh. 8 at 156-59. Hall's records demonstrate no evidence of a fractured jaw. Exh. 1 at 23.

    **1. IIU Interviews**

        **a.    Hall**

Wills interviewed Hall on February 17, 2010. Hall recounted that on June 20, 2009, while returning to the tier from the recreation yard, the door began to close and he "had to push it a little bit." Exh. 1 at 6. The officers in the unit were laughing at him when this happened. Hall stated aloud "Motherfuckers is crazy," whereupon Rice called him to the foyer. *Id*. When Hall walked out to the foyer where Officers Rice, Beeman, Faulkner, and Beal were sitting, Rice

taunted, "You ain't so bad without your fucking friends." *Id*. Officer Beal ordered Hall against the wall for a pat down search.

According to Hall, "Rice starting talking shit again." *Id*. Hall stated that he informed Rice he was a former boxer and "knocked dudes like you out." *Id*. Rice then "bum rushed" and sprayed on Hall. *Id*. Hall either fell or was forced to the floor and was punched and kicked by all four officers "for like 3 minutes." *Id*. Hall was then escorted to the medical department and later to the segregation unit. *Id; see also* ECF No. 16, Exhibit 6. Hall reported to Wills that his jaw was fractured but mentioned no other injury. *Id*. Wills states in the investigation report "I told him [Hall] that I reviewed his dental records and could find no mention of an injury to his jaw, he did not argue. He offered as an explanation that, he suspected the dentist did not want to get involved and did not properly document the injury." *Id*. Hall also indicated that he wanted to file a lawsuit and pursue criminal charges against the four officers.

        **b.**        **Other Witnesses**

Hall would not name witnesses, but indicated inmates located in cells he identified by number had watched the incident. Eight inmates were interviewed. None could recall nor knew anything else about the alleged assault. *Id*. at 7.

Lieutenant Robert Carder (Carder) was interviewed on March 11, 2010. Although not named in the Complaint, Carder was the officer-in-charge of the housing unit on the date of the incident. Carder stated Hall loitered on the tier when inmates were directed to return to their cells in preparation for an inmate count. Carder, who was in the control center when Hall was in the lobby to be searched, did not know what was said. Carder observed Hall "got agitated and ripped his shirt off." *Id*. at 8. Carder added "I think Ofc. Rice fogged him." *Id*. Carder indicated this appeared to be a justifiable use of force. *Id.*

### c. Defendants

All four Defendants were advised of their *Miranda* rights and agreed to answer the IIU investigator's questions without an attorney present. Exh. 1 at 8-9. Each officer has executed a declaration attesting to the truth and accuracy of their statements. Exhibits 2-5.

On March 11, 2010, Wills interviewed Rice, who told Wills that Hall "started getting agitated" when questioned about stopping at other cell doors on his way to his own tier. Exh. 1 at 8. Rice continued that after Hall was placed against the wall in the lobby to be searched, Hall tore his shirt off and "came at me." *Id.* Rice used the OC fogger [pepper spray][6] to fend off what he perceived to be an attack. He stated that no other force was needed to subdue Hall. *Id.*

During his interview on March 11, 2010, Officer Beeman (Beeman) recalled he was in the control center preparing for the inmate count procedure when he witnessed Hall force open the sliding door to his tier as it was closing. *Id.* at 8. Officer Beeman started to approach as Rice questioned Hall. Beeman states Hall "ripped off his shirt and became irate." *Id.* As Rice talked, Hall began to calm down and Beeman walked away. Beeman then heard a commotion and turned to see Rice use pepper spray against Hall. When Wills asked Officer Beeman "if he or any of the officers involved used more force than reasonably necessary to control the incident," Officer Beeman replied, "'No. Definitely not.'" *Id.*

Officer Faulkner (Faulkner) was interviewed on March 11, 2010. He told the investigator that "I believe Rice pulled him [Hall] up for some reason and went to pat him down. He took his shirt off and went toward Rice." *Id.* Faulkner said "Office Rice deployed OC, but additional force was not necessary." *Id.* Additionally, the report reads: "Faulkner stated, 'We had to take him down' to place handcuffs on Hall, but this did not include strikes of any kind." *Id.* When

---

[6] Defendants also refer to pepper spray as "OC" (oleoresin capsicum).

Wills asked Faulkner if he felt more than the necessary amount of force was used while restraining Hall, Faulkner answered, "No. Absolutely not." *Id*.

Officer Beal ("Beal") was interviewed on March 23, 2010. Beal recalled "Rice asked him a question and Hall ripped his shirt off." *Id*. at 9. Beal, who was standing closest to Hall when Rice used the pepper spray, stated that Hall was restrained five to ten seconds after the pepper spray was deployed. The Report states "Beal denied that excessive force was used and said that neither he nor any of the other officers involved struck Hall during the incident. *See id*.

Wills completed the IIU Report on March 24, 2010, concluding the corrections staff had acted within the Use of Force Manual guidelines and there was no evidence to suggest use of excessive force. Exh. 1 at 9-10.

### C. North Branch Correctional Institution Records

On June 24, 2011, Hall was transferred from WCI to NBCI and placed on administrative segregation where he is monitored by the institution's Case Management Team and the Warden or his designee. Exh. 7 at 7-29. The prison records show that Hall has been continued on administrative segregation because he was deemed a threat to staff. *Id*.[7] He was transferred to NBCI after he was identified as a high ranking member of a Security Threat Group (STG) and was involved in the serious injury of two WCI officers. *Id*. Hall's placement and behavior on administrative segregation is monitored daily, and includes recording his opportunities for out-of-cell recreation and showers. Exh. 7 at 30-70.

Review of Hall's medical records from NBCI do not reveal any physical problems specifically attributable to his segregation placement or injury caused by correctional officers. Hall's medical records at NBCI indicate he has at times complained of and been seen by medical providers for stomach pain, acne, blood in his stools, new eyeglasses, tooth pain, allergies,

---

[7] Case Management Review records indicate that Hall threatened the Review Team in 2012. ECF No. 7 at 20.

headaches,[8] rashes, chest discomfort, an injured ankle from playing basketball, a swollen thumb, and insomnia. Exh. 8 at 21-54, 171-187. Hall is provided periodic medical check-ups. *See, e.g*. *Id*. at 190 and 193.

## Standard of Review

**A. Motion to Dismiss**

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.1979).

**B. Motion for Summary Judgment**

Summary Judgment is governed by Fed.R.Civ.P. 56(a) which provides summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

---

[8] Hall blames his headaches on an injury sustained in 2008, when he was "shot in the head." Exh. 8 at 39, 40 and 209.

7

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247–48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr.,* Inc., 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on

those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

### Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollan*, 443 U.S. 137 (1979). Mindful that Hall is a self-represented litigant, this court has accorded his pleadings generous construction, s*ee e.g. Estelle v. Gamble*, 429 U.S. 97 (1976); *Erikson v. Pardus*, 551 U.S. 89, 94, 127 (2007), and his excessive force and conditions of confinement claims will be examined in the context of Eighth Amendment analysis.

**A. Excessive Force** [9]

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1176–78 (2010) (per curiam ); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and

---

[9] Defendants request dismissal of Hall's claims arising from the June 20, 2009, incident as untimely. There is no federal statute of limitations for civil rights claims filed under 42 U.S.C. § 1983, and federal courts routinely measure the timeliness of federal civil rights suits by state law. *See Wilson v. Garcia*, 471 U.S. 261, 271 (1985). Maryland's general three-year statute of limitations for civil actions is most applicable to the case at bar. *See* Md.Code Ann., Cts. & Jud. Proc., § 5–101. Federal law, however, governs the question of when a cause of action accrues. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). As a general rule, the statute of limitations starts to run when a plaintiff knows or has reason to know of his injury. *See id*. This Complaint was filed November 5, 2012. While the incident occurred on June 20, 2009, the IIU investigation report was not completed until March 24, 2010. Accordingly, the court will not dismiss this case as filed outside the statute of limitations.

sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. Not every malevolent touch by a prison guard, later determined in the calm of a judge's chambers to be gratuitous, gives rise to a federal cause of action. *See Hudson*, 503 U.S. 1, 6 (1992). In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). But, it is a factor in applying and reviewing the Eighth Amendment analysis. *Id*. Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins,* 559 U.S. at 34.

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When correctional officers use force to keep order, they have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7.

In this case, there is no dispute that Hall was positioned for a pat down search. Officer Rice and Hall exchanged words. Hall told Rice that he was a former boxer and "knocked dudes like you out." *See Supra* p. 4. Hall removed his shirt. Rice then used pepper spray to subdue Hall. Hall was restrained in handcuffs just seconds after the pepper spray was deployed without further incident or need for additional force and taken to the medical unit for pepper spray exposure. Notably, Hall's medical records do not substantiate his allegation of a fractured jaw or suggest he sustained any physical injury other than exposure to pepper spray.

The record demonstrates there was a reasonably perceived threat to security and a brief and limited use of force, i.e. the application of two bursts of pepper spray. There is no evidence to suggest the force used was sadistic or malicious. Once handcuffed, Hall was taken to the medical unit for a shower and evaluation. Based on the record, the court finds that when the facts are judged in the light most favorable to Hall, no genuine issue of material fact is presented and Defendants are entitled to summary judgment in their favor as to this claim as a matter of law.

### B. Conditions of Confinement

In determining whether conditions amount to cruel and unusual punishment in violation of the Eighth Amendment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). This deference is at its greatest when prison order is at stake. *See In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464, 469 (2003). Poor conditions of confinement do not necessarily violate the Eighth Amendment to the Constitution; only conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "The Constitution ... 'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized

measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Setter*, 501 U.S. 294, 298 (1991) (citations omitted).

In order to demonstrate cruel and unusual punishment, a plaintiff must prove two elements - that he suffered deprivation of a basic human need that was "objectively sufficiently serious," and that "subjectively [defendants] acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir.1995) (emphasis in original; citation omitted). Hall claims without factual predicate that he is subjected to torture tactics, racial profiling, foul play, false statements and false imprisonment. Additionally, he complains that he was placed on "lock-up" at NBCI for almost eighteen months without receiving a "ticket."[10]

Hall neither disputes his involvement in an assault on corrections officers nor that he is a high-ranking STG member. *See supra* p. 6. Further, none of Hall's claims, all generally stated, amount to a claim of constitutional magnitude. First, Hall does not allege significant physical or emotional injury resulting from any challenged conditions. *See Strickle v.Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (requiring an inmate to produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions to succeed on an Eighth Amendment claim). Second, as Defendants note, Hall fails to name any individuals at NBCI

---

[10] There is no indication that Hall is assigned to disciplinary segregation, requiring issuance of a "ticket." Segregated confinement does not ordinarily present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. *See Sandin v. Connor,* 515 U.S. 472, 486 (1995). The facts alleged by Hall are readily distinguishable from those in *Wilkinson v. Austin,* 545 U.S. 209 (2005), where the Supreme Court held that conditions in segregation depriving an inmate of "almost any environmental or sensory stimuli and almost all human contact" and other onerous conditions, limited only by the inmate's sentence gave rise to a liberty interest implicating due process. "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and] are contemplated by his original sentence to prison ...." *Gaston v. Taylor,* 946 F.2d 340, 343 (4th Cir.1991). Generally, prisoners do not have a constitutionally recognized liberty interest in a particular security classification or prison placement. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (no constitutional right under the Due Process Clause to a particular security classification or prison placement). An inmate does not have a constitutional right to be confined in a particular location. *See Olim v. Wakinekona*, 461 U.S. 238, 248 (1983);*Meachum v. Fano*, 427 U.S. 215, 224-25 (1976). As presented here, Hall's assertions do not state a claim of due process violation.

who are personally involved in the matters alleged.[11] To the extent Hall seeks to hold the Warden responsible based on principles of supervisory liability, § 1983 actions may not be premised upon respondeat superior.[12] *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Instead, supervisory liability is "determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.' " *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). "Supervisory liability under § 1983 must be supported with evidence: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud,* 13 F.3d at 799. Accordingly, Hall's conditions of confinement claims will be dismissed.

## Conclusion

For these reasons, Defendants' dispositive motion will be granted and this case closed by separate order to follow.

Date:  February 25, 2014                                       /s/
                                                      DEBORAH K. CHASANOW
                                                    United States District Judge

---

[11] Plaintiff was directed to supplement the Complaint to include the names of the individuals whom he claimed were responsible for alleged wrongdoing and facts supporting his claims. ECF No. 2. No additional NBCI defendants were named in his supplemental to the Complaint. ECF No. 3.

[12] Respondeat superior is a legal doctrine whereby an employer or principal may be held responsible for its employees or agents.